## UNITED STATES DISCTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ERIC GUNDRUM and MICHAEL KING,  :
Individually and on behalf of all persons :
similarly situated,        :
             :
        **Plaintiffs,** :  CIVIL ACTION NO.: 16-cv-369
   **v.**          :
             :
CLEVELAND INTEGRITY SERVICES, :
INC.,            :
             :
       **Defendant.** :

## DEFENDANT'S OPPOSITION TO MOTION FOR CONDITIONAL CERTIFICATION

## I. INTRODUCTION

Messrs. Gundrum and King seek this Court's approval under *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989) for court-ordered notice for a collective action under the Fair Labor Standards Act ("FLSA"). Yet, their motion is wholly inconsistent with the Supreme Court's instructions and with its focus on case-management.

Their proposal is overbroad. Messrs. Gundrum and King worked in only one job title ("utility inspector") on two projects. Yet, their motion seeks a collective action encompassing over 2,800 individuals who worked in 172 job titles on 5,800 job orders/projects for 138 different clients: *i.e.,* no similarity of working conditions, of supervision, or work duties.

Their proposal is unsupported factually. It offers only mirror-image declarations from Messrs. Gundrum, King, and four others that fail to address the core issue in this case: who is properly classified as an exempt executive or administrative employee under the FLSA (which is, as a matter of law, an individualized inquiry: 29 C.F.R. §541.2). Their declarations merely assert that they were employed by Cleveland Integrity Services, Inc. ("CIS"), worked more than

40 hours in some weeks, and did not receive overtime.  These are truisms for every FLSA exempt employee in America and, thus, meaningless.

Their proposal is unsupportable legally.  The seemingly impressive array of authority in "Plaintiff's Memorandum of Law In Support Of Expedited Motion For Conditional Certification And To Facilitate Notice Pursuant To 29 U.S.C. §216(b)" ("Pls'. Memo.") is merely promiscuous citing of inapposite cases.  For example, their core argument  (Pls'. Memo., at pp. 11-19) cites 39 cases on FLSA collective action certification, but only three -- all distinguishable -- even mention or address collective actions like this one involving the executive or administrative exemptions.  It is, moreover, not for lack of decided cases on collective actions in suits involving those exemptions: this brief highlights more than a dozen decisions rejecting collective actions in cases involving those exemptions because of the individualized analysis required.

Simply stated, Plaintiffs' motion is baseless and should be denied.

## II.    CONTEXT

### A.  Procedural Background

Messrs.  Gundrum and King filed this suit on June 2 and filed this motion contemporaneously with serving their Complaint on CIS.  Since then, four other individuals have filed consents in the hope of being accepted as opt-ins.

Gundrum and King both have Arbitration Agreements with CIS which mandate arbitration in Cleveland, Oklahoma.  Because this Court -- under controlling Seventh Circuit authority -- cannot rule on whether arbitration should be ordered, CIS has filed a motion to transfer this case to the Northern District of Oklahoma.  If that motion is granted, then this motion becomes moot: the entire case becomes the work of that transferee court.

But, what if that motion is denied?  Different problem.  Plaintiffs' Memorandum at pp. 20-22 mistakenly asserts that the Arbitration Agreements are irrelevant.  That assertion is based on a litany of case law uniformly involving named plaintiffs with no arbitration commitments but potential invitees to the collective action having such agreements.  Those cases rightly note that -- in that context -- the fact that some invitees might later be found ineligible to participate does not derail an otherwise justifiable basis for FLSA collective action notice.

This case, however, is radically different.  Here, if the Arbitration Agreement is enforced, there is no case for the invitees to join: the litigation shifts entirely to arbitration.  Whether the court rules that arbitration must be individual or whether it defers that decision to the arbitrator is of no moment to mooting any court ruling (here or in the Northern District of Oklahoma) on whether this motion should be granted or denied.

Plaintiffs have put the cart before the horse in advancing this motion before those issues.

## B. Factual Background

CIS does not build pipelines, refineries, or anything else.  Rather, it provides inspection and construction management services to clients engaged in such projects. Its website describes its work as follows:

> **Cleveland Integrity Services** offers clients a complete range of services to assist in the construction and Implementation of pipeline, refinery, power plant and Mechanical Integrity projects. . . . Our services can be utilized singularly or in combination to meet specific needs appropriate to the project. We are able to staff one person assignment all the way up to projects requiring hundreds of staff. . . . CIS personnel can handle the more complex construction management and inspection problems found in today's construction environment.

http://www.clevelandintegrity.com/; Declaration of Michael Frye at ¶2 (attached as Exhibit A).

Plaintiffs' Complaint confirms this self-description:

> [CIS] is a limited corporation providing third party inspection services for the construction and maintenance of oil and natural gas transmission, midstream and gathering lines, facility construction, meter runs and many other types of oil and gas construction…[CIS personnel] perform a variety of inspection services . . . for energy, public utility and pipeline companies.

Complaint at ¶¶5-6.

Both CIS' website and Plaintiffs' Complaint echo each other in confirming that CIS' work (and thus the tasks of its employees) are project-driven; that the projects vary in size, scope, and demands; and that all of those are a function of the clients' demands.

This proposed collective action encompasses all of CIS' FLSA exempt field employees. Gundrum and King held only one job: utility inspector. *See* Declarations of Gundrum and King at ¶¶4-5, ECF Nos. 6-9, 6-10.  That is one job title out of 172 different job titles encompassed in their proposed collective action (which, if granted, would encompass approximately 2,800 current or former employee). *See* Frye Declaration at ¶3.  There is no connection to the other 171 jobs.

Gundrum and King each worked on the same two projects: the Flannagan South Pipeline project and the Line 66 Pipeline project. Gundrum and King Declarations at ¶¶4-5.  During the time period covered by their proposed collective action, CIS has 5,900 jobs for 138 different clients.  Gundrum and King have no connection to the other 5,888 jobs. *See* Frye Declaration, *supra*.

Gundrum worked at CIS for 70 weeks; King worked for 49 weeks. Frye Declaration at ¶4.  Their proposed collective action, however, encompasses over 108,000 workweeks. *Id*.  Their exposure to the proposed collective is infinitesimal: less than one-tenth of one percent (which renders Messrs. Gundrum and King's assurance that each "observed other members of the FLSA Collective . . . " -- *see* Complaint at ¶¶20, 22, 23, and 28 -- devoid of significance).

Mirror image declarations from Gundrum, King, and four other opt-ins add no detail. Each merely asserts that the individual was employed by CIS, worked more than 40 hours in some weeks, and did not receive overtime. These are truisms for every FLSA exempt employee in America.

## III.   COLLECTIVE ACTION ANALYSIS

### A.   Framework for Collective Action Analysis

Plaintiffs propose a two-step approach of "approve now, worry later" that admittedly has never been adopted by either the Supreme Court or the Seventh Circuit. *See* Pls'. Memo., at p. 11. While this two-step approach (which originated in cases under the ADEA) has often been used by district courts in FLSA cases, it cannot be reconciled with either the statute or the Supreme Court's guidance in *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989).

Judge Posner's prescient admonition that "there isn't a good reason to have different standards for the certification of" Rule 23 class actions and FLSA collective actions is on point. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013). There is an approach that is consistent with the FLSA and with *Espenscheid*: the one-step approach adopted in *Delpin Aponte v. U.S.*, 83 Fed. Cl. 80, 91-92 (2008). That is the proper approach here too.

### 1.   ADEA Two-Step Analysis Is Unworkable In FLSA Cases

History reveals that the two-step process originated in *Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D. N.J. 1987): an ADEA case. *See* Pls'. Memo., at § IV.A. Under *Lusardi*, in "Step One" the court "conditionally certifies" a collective action upon "modest" evidence, thereby providing members with notice so that they might opt into the action.[1] *Lusardi*, 118 F.R.D. at

---

[1]   This "modest factual" showing during "Step One" (Pls'. Memo., at p.12.) is merely another flaw in the *Lusardi* methodology. The burden for all judicial rulings (unless altered by statute) is the same: the preponderance of the evidence. For that reason, courts have properly rejected requests for such "modest" burdens in evaluating Rule 23 motions. *Teamsters Local 445 Freight Division Pension Fund v.*

358-61. In "Step Two," the defendant moves to "decertify" the collective action after discovery; only at this stage does the Court consider, *inter alia*, manageability of trying the claims together, or if some or all opt-in plaintiffs should be dismissed. *Id.*

Unlike the FLSA, the ADEA requires a plaintiff to exhaust administrative remedies before instituting a lawsuit; however, an opt-in plaintiff in an ADEA case can bypass this by "piggybacking" on a conditionally certified collective action. *Bettcher v. Brown Schs., Inc.,* 262 F.3d 492, 494 (5th Cir. 2001). Thus, if the collective action is later decertified, the opt-in "piggyback" plaintiffs are properly dismissed and cannot pursue an individual action for failure to timely exhaust EEOC administrative remedies. *Id.*

This, however, cannot be transposed to the FLSA, so decertification in the FLSA context is pyrrhic: FLSA opt-in plaintiffs -- solicited by court-authorized notice -- cannot be dismissed because there is no administrative exhaustion requirement under the FLSA. The "decertification" of an FLSA collective merely splits one lawsuit into as many lawsuits as there are collective action opt-ins.

*Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 522 (5th Cir. 2010), illustrates this defect in transposing the ADEA process onto the FLSA. There, conditional certification was granted in the original case. *See Proctor, et al. v. Allsup's Convenience Stores, Inc., et al.*, 250 F.R.D. 278 (N.D. Tex. Apr. 24, 2008). Thereafter, over 1,000 opt-in plaintiffs joined. After discovery, the district court decertified the collective action and dismissed the opt-in plaintiffs. Those dismissed opt-ins immediately instituted *Acevedo*, alleging identical claims on behalf of 800 of the opt-ins dismissed from *Proctor*, who together had worked at 300 of the

---

*Bombardier, Inc.,* 546 F.3d 196 (2d Cir. 2008) (appropriateness of class treatment satisfied only by a preponderance of the evidence); *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305 (3d Cir. 2009) (same); *Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 228 (5th Cir. Tex. 2009) (same).

defendant's stores. *Acevedo*, 600 F.3d at 518-19. After the district court dismissed *Acevedo*, the Fifth Circuit reversed, requiring the district court to handle the action on a store-by-store basis -- resulting in 300 "mini-trials." *Id.* at 522.

*Acevedo* is precisely why the *Lusardi* approach is untenable in FLSA cases: it actively and prematurely solicits, on minimal evidence, voluminous opt-in plaintiffs who cannot be truly dismissed on decertification, but, rather, will be segmented into separate lawsuits. Beyond the impracticality, it also transgresses the Supreme Court's instruction that collective notice is "for case management purposes" only, and not "the solicitation of claims." *Hoffmann-LaRoche,* 493 U.S. at 174. Given the distinctive differences between the ADEA and the FLSA, the "approve now, worry later" *Lusardi* approach is nothing but solicitation.

2. Only A One-Step Analysis Maintains Fidelity To *Hoffman-LaRoche*

Soliciting opt-in plaintiffs who cannot be sustained in a manageable case ignores the instructions of the Supreme Court in *Hoffmann-LaRoche*, creates nightmares in case management of FLSA cases as illustrated in *Acevedo*, and improperly rejects the guidance of *Espenscheid.* Yet, there is another way: a one-step analysis has already been adopted in the Federal Circuit for FLSA collective action cases and avoids those infidelities.

In FLSA collective actions, the Federal Circuit anticipated *Espenscheid*'s recognition that "there isn't a good reason" (705 F. 3d at 772) to create artificial standards like those invented in *Lusardi* or to do so in multiple stages. Rather, the traditional inquires of class certification -- such as typicality, commonality and adequacy of representation -- perfectly serve to evaluate who is "similarly situated" for purposes of FLSA collective actions. *Delpin*, 83 Fed. Cl. at 91-92. Avoiding the *Acevedo* nightmares and remaining faithful to *Hoffmann-LaRoche*'s instructions on avoiding solicitation, courts there decline collective actions on speculation evidence but permit

notice when justified on the kind of record traditionally supporting Rule 23 certifications. *Smith v. U.S.*, No. 13-161C, 2014 WL 3940494, at *2 (Fed. Cl. Aug. 11, 2014) (denying FLSA collective action certification and expressly rejecting "the judicially created two-step process").

This approach is actually more consistent with the purpose of the FLSA's opt-in procedure, which was adopted "to prevent large group actions." *Delpin*, 83 Fed. Cl. at 92 (*quoting U.S. v. Cook,* 795 F.2d 987, 993 (Fed. Cir. 1986)); *see also Hoffmann-LaRoche*, 493 U.S. at 173 (confirming this statutory purpose: Congress created the FLSA's opt-in requirement as part of the Portal-to-Portal Act of 1947 "for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and **freeing employers of the burden of representative actions**") (emphasis added).  Single step determination of collective action status on a developed record better accommodates the policy of allowing notice with that equally important statutory goal of limiting the burden on employers:

> Section 216(b)'s **affirmative permission for employees to proceed on behalf of those similarly situated** must grant the court the requisite procedural authority to manage the process of joining multiple parties **in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions** of the Federal Rules of Civil Procedure.

*Hoffmann-La Roche*, 493 U.S. at 170 (emphasis added).

### B.  Framework for FLSA Exemptions At Issue

Regardless of the number of steps, the core issue in this case is exempt status.  There is no dispute whether Messrs. Gundrum and King received overtime: neither did because each was treated by CIS as overtime exempt under the FLSA.  What is in dispute is only the correctness of each individual's classification as overtime exempt under the FLSA.

In short, there are four separate tests potentially applicable to members of this proposed collective action (and sometimes multiple tests to the same individual if his job or compensation

changed during the applicable time period).  Gundrum and King must be evaluated as exempt administrative employees under the FLSA's regular test. 29 CFR §§ 541.200-541.204.  Some of their proposed collective action invitees (*e.g.*, Construction Manager and Chief Inspectors) must be evaluated under the regular test for the executive exemption, 29 CFR §§ 541.100-541.106; others must be evaluated under the test for highly compensated employees as either executive exempt or administrative exempt, 29 CFR § 541.601.[2]  Understanding the issues under these tests is a prerequisite to determining whether Messrs. Gundrum and King can be considered "similarly situated" to any other CIS exempt employees.

For those subject to the executive exemption, the key is the authority to control and direct other employees: *i.e.*, they must "customarily and regularly direct[] the work of at least two or more other employees . . . [and must] ha[ve] the authority to hire or fire other employees, or [the executive's] suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [must be] given particular weight." 29 CFR § 541.100.

For those subject to the administrative exemption, the key is whether their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 CFR § 541.200.  This obviously is a far different inquiry than the executive exemption but, like that exemption, it is individualized:

---

[2]     Messrs. Gundrum and King (and their proposed collective) are compensated by a day rate subject to a weekly guarantee.  Frye Declaration at ¶6.  That fully meets the salary status component of these exemption tests, which focus on the practical reality of compensation, not its name: "[t]he regulations do not require that the wages be called a 'salary' to qualify as being 'paid on a salary basis.'" *Akins v. Worley Catastrophe Response, LLC*, 2013 WL 1907486, at *4 (E.D. La. May 8, 2013) (rejecting assertion that label of "day rate" foreclosed application of salary test).  Indeed, the regulations explicitly confirm this point: "An exempt employee's earnings may be computed on an hourly, a **daily** or a shift **basis**, without losing the exemption or violating the salary basis requirement . . . ." 29 C.F.R. § 541.604(b) (emphasis added).

> A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part.

29 C.F.R. §541.2.

Today is not the day to decide whether Messrs. Gundrum and King are exempt but only to decide if there is a "feasible litigation plan" (*Espenscheid*, 705 F.3d at 776) for proceeding on their claim of being nonexempt along with some or all of their colleagues.   Plaintiffs cite two cases (Pls'. Memo. at p. 7) to mistakenly assert that inspectors are nonexempt as a matter of law. Not so.

In fact, other cases show that the results are fact, context, and individual specific:

- *Brock v. On Shore Quality Control Specialists, Inc*., 1987 WL 31308 (W. D. Tex. Sept. 29, 1987) (**pipeline inspectors** are exempt administrative employees under the FLSA);

- *O'Dell v. Alyeska Pipeline Serv. Co.*, 856 F.2d 1452 (9th Cir. 1988) (**field inspector on pipeline** was exempt administrative employee);  and

- *Dewan v. M-I, L.L.C.*, 2016 WL 695717 (S.D. Tex. Feb. 22, 2016) (granting summary judgment for employer; **drilling fluid specialists** met administrative exemption because their work in guiding oil drilling involved making decisions to "optimize drilling performance . . . considering and evaluating alternative courses of action, thus requiring them clearly to exercise discretion and independent judgment").[3]

Here, it is not the single job title that Messrs. Gundrum and King held (utility inspector) but that job title and 171 other job titles; not a single location but a myriad of locations with customized instructions and duties based on the discrete needs of the 138 customers being served; not a single FLSA exemption but four: the regular tests for executive and administrative exemptions along with the highly compensated tests for each of those exemptions.[4]   There is no

---

[3]    Plaintiffs' quotation of the applicable regulation confirms what the case law discloses.  Inspectors are sometimes properly exempt and sometimes not: "**Ordinary** inspection work **generally** does not meet the duties requirements for the administrative exemption."  29 C.F.R. § 541.203(g) (emphasis added).

[4]    The test for "highly compensated employees" is defined in the Department of Labor regulations:

single answer for the 2,800 CIS field employees that Messrs. Gundrum and King erroneously suggest are identical.

*Zannikos v. Oil Inspections*, 2015 WL 1379882 (5th Cir. Mar. 27, 2015) perfectly illustrates why individualized analysis is inescapable.  There, three plaintiffs -- all holding the same inspector job monitoring the movement of oil to/from ships at the same location -- asserted that each should have been paid overtime.  Zannikos, who earned over $100,000 per year and was measured under the highly-compensated test, lost; his co-plaintiffs (James and William Cormier) won.

Simply stated, individual analysis is unavoidable for these FLSA exemptions.

### C.  Inappropriateness of Collective Action Here

Collective actions are only appropriate for those who are "similarly situated" -- which is the explicit statutory standard under the FLSA for collective actions (29 U.S.C. §216(b).  Logically and legally, "similarly situated" must be interpreted in the context of the issues to be addressed in each FLSA case.  This is confirmed by the Supreme Court's articulation of why (and, as a result, when) collective actions are permitted: "The judicial system benefits by **efficient resolution in one proceeding of common issues** of law and fact arising from the same alleged . . . activity."  *Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 170 (1989) (emphasis

---

An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part. . . .

[That] level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties. Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part.

29 C.F.R. §541.601(a) and (c).

added).  This demands an evidence-driven approach to authorizing collective actions based on "**management of litigation.**" *Id*. at 171 (emphasis added).

Here, there are two key flaws barring the proposed collective action.[5]

**First**, this is a case about whether employees fall under 1 or more of 4 separate exemptions: executive exemption, administrative exemption, highly compensated executive exemption, and highly compensated administrative exemption.  Who is similarly situated by being a Packer fan or by having a Social Security number that has a 7 in the sequence is meaningless.  So too are the declarations proffered here which merely confirm that these employees were not paid overtime (which is not in issue and which, if the exemption is properly applied, is 100% proper).

Rather, courts must look to whether Messrs. Gundrum and King and the "individuals they seek to represent are **similarly situated with respect to factors relevant to the exemption analysis.**" *Ruiz v. Serco, Inc*., No. 10-CV-394-BBC, 2011 WL 7138732, at *4 (W.D. Wis. Aug. 5, 2011) (emphasis added) (citing *Holt v. Rite Aid Corp*., 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) ("the 'similarly situated' inquiry in this case must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt")); *Aguirre v. SBC Commc'ns, Inc*., 2006 WL 964554, at *12 (S.D. Tex. Apr. 11, 2006) (holding that to determine whether employees are similarly situated in a misclassification case, court must consider employees' duties, amount of time spent on duties and extent of discretion exercised).

---

[5]     Whether there is some smaller collective action that might be justified by Messrs. Gundrum and King after discovery remains to be seen.  Perhaps, there ought to be a rule that there are no second chances, but there is no controlling case law to that effect.  Thus, denying collective action status is not final but, like all interlocutory orders, is one that the Court may revisit later **IF** there is a real basis then. Plaintiffs may be tempted to offer alternative universes in their reply brief but those -- shielded from any rigorous analysis in briefing -- ought not be entertained.

Consistent with *Ruiz*, misclassification cases seldom qualify for collective actions.   In such cases, the need to engage in individualized inquiries of each claimant defeats the judicial efficiency of the collective action model:

- *Steger v. Life Time Fitness, Inc.*, No. 14-CV-6056, 2016 WL 245899, at *4 (N.D. Ill. Jan. 21, 2016) (denying FLSA conditional certification where the issue was exemption with commission as form of compensation; "the highly individualized inquiries which will be required would substantially eliminate the judicial efficiency, and the resulting benefit to the parties, traditionally attained through the collective treatment of claims");

- *Strait v. Belcan Eng'g Grp., Inc.,* 911 F. Supp. 2d 709, 720 (N.D. Ill. 2012) (denying FLSA conditional certification: "Although Plaintiffs dedicate twenty-two pages of their memorandum supporting certification motion and nineteen pages of their reply brief to the issue of whether [defendant] pays the [class member] employees on a salary basis under the FLSA, the Court need not resolve this issue in order to reach the question of certification.   Rather, the issue for certification is whether the Plaintiffs are similarly situated -- whether a common question exists that can be answered without individualized inquiries."); and

- *Forney v. TTX Co.*, No. Civ.A. 05 C 6257, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) (denying FLSA conditional certification where administrative and professional exemptions were at issue; "Whether similarly situated employees

exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions.").[6]

**Second**, separate and apart from the fact that highly individualized inquiries in exemption cases inherently limit large-scale FLSA collective actions, this case is especially unfit for conditional certification. Messrs. Gundrum and King each held only one job: Utility Inspector. Yet, their proposed collective action encompasses 172 different jobs and a total of approximately 2,800 current and former employees across the nation, reporting to different supervisors, working different hours, and importantly, performing varying day-to-day duties. *See* Frye Declaration at ¶3.

This is a bridge too far. *Ruiz* at *5 cogently explains why:

---

[6]      *Steger*, *Strait*, and *Forney* are illustrative.  Rejection of conditional certification in collective actions (especially on the scale proposed here) in cases involving the executive or administrative overtime exemptions is widespread.  *See, e.g.*, *Aguirre v. SBC Commc'ns, Inc.*, Civ. A. No. H-05-3198, 2007 WL 772756, at *12 (S.D. Tex. Mar. 12, 2007) (denying renewed motion for conditional certification of FLSA collective action where the issue was the executive exemption; plaintiffs must be similarly situated in the "kind of duties they had, the amount of time they spent on these duties, and the extent of the discretion they exercised;" "In cases with . . . variability among the members of the putative class of allegedly misclassified employees, courts have refused to certify the case for collective treatment because an individual inquiry into each plaintiff's job duties is required."); *Diaz v. Electronics Boutique of Am., Inc.*, No. 04-CV-0840E, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005) (denying conditional certification of FLSA collective action where the issue was the executive exemption: "Although [the plaintiffs] share the same job description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each [plaintiff's] duties is required, making class treatment inappropriate."); *Dailey v. Groupon, Inc.,* No. 11 C 05685, 2014 WL 4379232, at *6 (N.D. Ill. Aug. 27, 2014) (Rule 23 class denied where the administrative exemption was at issue because the types of duties that each account representative performed, the amount of time each account representative spent on a certain duty, and also the amount of independence and discretion for each account representatives varied;  individualized factual and legal inquiries were necessary to assess the class members' primary duties and whether they customarily and regularly exercised discretion and independent judgment); *Tahir v. Avis Budget Group, Inc.*, No. CIV.A. 09-3495 SRC, 2011 WL 1327861, at *4 (D.N.J. Apr. 6, 2011) (denying conditional certification of FLSA collective action where executive and administrative exemptions at issue because "establishing an FLSA violation in this case requires an examination of the individual employee's duties and tasks vis-à-vis the exempt category into which Defendants maintain all [putative class members] fall . . . the tests for determining whether an individual's work is of an executive or administrative nature involve several criteria and depends on the application of many factors to a particular employee's situation."); *Guillen v. Marshalls of MA, Inc.*, No. 09-CV-9575, 2012 WL 2588771, at *1-2 (S.D.N.Y. July 2, 2012) (denying plaintiffs' second attempt at conditionally certifying FLSA collective action; the "mere fact of a common FLSA-exempt designation, job description, or uniform training is insufficient to find ASMs 'similarly situated' for FLSA purposes.").

> "[T]he proposed class included approximately 1,000 employees working in 15 different positions under different supervisors in different locations around the country.  Although the evidence shows that employees working in the various positions performed some similar or overlapping tasks, the evidence does not demonstrate that the primary duties of the potential class members are sufficiently similar or that they exercised similar levels of discretion and responsibility while carrying out their primary duties."

*See also*, *Belcan Eng'g Grp., Inc.,* 911 F. Supp. 2d 709, 720  (N.D. Ill. 2012) (denying FLSA collective action where, as here, defendant employed dozens or hundreds of FLSA exempt employees working on outsourced projects, working at more than 20 of defendant's facilities and 30 of defendant's customer's facilities).[7]

This case offers even less justification for collective action than what fell short in *Ruiz*. There, plaintiffs actually put forth evidence detailing their job duties in their declarations.  While that was too little to demonstrate a sufficient basis for conditional certification, it is also far more than Messrs. Gundrum and King proffer here.  *Ruiz*, *supra* at *6 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011): "[w]hat matters to class certification . . . is not the

---

[7]     *Ruiz* and *Belcan* are merely the tip of the iceberg; their expressed concern with unmanageability of national collective actions involving exemptions is a systematic reaction across the country.  *See, e.g.*, *Moore v. PNC Bank, N.A.*, No. 2:12-CV-1135, 2013 WL 2338251, at *5-6 (W.D. Pa. May 29, 2013) (denying conditional certification and rejecting "argument [that] boils down to the proposition that any employee classified as exempt by a company that does business nationwide is entitled to approval of a collective action for all employees of that business -- who may number in the thousands and be spread across 50 states -- simply based on the employee's testimony that [s]he was required to perform non-exempt tasks"); *Tyler v. Payless Shoe Source, Inc.*, 2005 WL 3133763, at *5 (M.D. Ala. Nov. 23, 2005) (denying FLSA collective action on a nationwide basis; stores differ greatly in size so it "is reasonable to imagine that they have very different job duties"); *Guillen v. Marshalls of MA, Inc.*, No. 09-CV-9575, 2012 WL 2588771, at *1-2 (S.D.N.Y. July 2, 2012) (denying conditional certification of FLSA collective action because a "handful" of affidavits were insufficient to create a nexus between plaintiff's claims and those of thousands of other employees nationwide); *Jenkins v. TJX Companies, Inc.*, 853 F. Supp. 2d 317, 324-25 (E.D.N.Y. 2012) (denying conditional certification of FLSA collective action; conclusory allegations and testimony were not sufficient "to certify a class consisting of over 700 employees at more than 200 stores nationwide"); *Bramble v. Wal-Mart Stores, Inc.*, 2011 WL 1389510, at *5 (E.D. Pa. Apr. 12, 2011) (denying conditional certification of FLSA collective action where "[p]laintiffs provided little evidence to substantiate their assertions that their responsibilities, as performed, were similar to those actually performed by other [proposed class members], either at their stores or at other stores nationwide").

raising of common 'questions -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." (Emphasis in original; internal citations omitted)); *see also Pfaahler v. Consultants for Architects, Inc.,* No. 99 C 6700, 2000 WL 198888, at *2 (N.D. Ill. Feb.8, 2000) (denying conditional certification because plaintiff "makes no showing that other potential claimants performed the same type of duties as himself" and "provides no grounds indicating his knowledge of the work other workers performed, the circumstances under which work was performed . . . ").

Here, Messrs. Gundrum and King's grandiose demand for a case of 2,800 individuals in 172 job titles whose exempt status is being challenged cannot be justified factually, cannot be managed, and certainly cannot be tried in a single lifetime; it is a self-defeating request.  There is neither legal precedent nor factual basis for a collective action analyzing the executive and administrative exempt status of that many individuals and that many job titles at over 5000 jobs for 138 different clients.[8]

## IV.   ANALYSIS OF PROPOSED NOTICES

There is no viable collective action, so Plaintiffs' proposed notice plan is moot.

---

[8]      Regrettably, the array of case authority in Plaintiffs' brief is a Potemkin village. Plaintiff's Memorandum (at pp. 11-19) cites 39 cases in their argument on FLSA collective action certification, but only three mentioned either the executive or administrative exemption as an issue.  Those three, moreover, do not support Messrs. Gundrum and King's request for a collective action involving over 100 job titles performed on thousands of different job sites in a variety of discrete contexts. *Betancourt v. Maxim Healthcare Servs., Inc.,* No. 10 C 4763, 2011 WL 1548964, at *9 (N.D. Ill. Apr. 21, 2011) involved but one job: staff recruiters. *Jirak v. Abbott* Labs., Inc., 566 F. Supp. 2d 845, 850 (N.D. Ill. 2008) likewise involved only one job title: pharmaceutical representatives. *Wischnewsky v. Coastal Gulf & Int'l, Inc*., No. CIV.A. 12-2277, 2013 WL 1867259, at *5 (E.D. La. May 2, 2013) is a one-off: a case where the employer's putative defense of exempt status was mooted by the admission in its own offer letters verifying that each job was "nonexempt."

But, for the sake of argument, let's review what is commendable and what is forbidden in that proposed notice plan.  The touchstone for any notice plan, of course, is the Supreme Court's decision in *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989).  There, the Supreme Court emphasized that notice is a function of case management, and thus entails the trial court's judgment on the manageability of the proposed collective (*i.e.*, is this a case that can cohesively be tried?).  While it is proper for the trial court to fulfill the statutory objective of notifying those who have the option to join a manageable case, the outer limit is equally clear: "Court intervention in the notice process for case management purposes is distinguishable in form and function from the solicitation of claims." *Id.* at 174 (emphasis added).

The basic structure of Messrs. Gundrum and King's proposed notice plan is perfectly proper.  Indeed, the suggestion of using a third-party neutral to avoid solicitation is commendable, albeit imperfect in two ways: (1) the whole point of that effort is undercut unless the data goes solely to the neutral, rather than to Plaintiffs' counsel, and (2) the cost ought to be a shared expense between the parties rather than borne solely by Plaintiffs.  So too, the proposal for 90 days is consistent with best practices.

However, this plan impermissibly slides into solicitation in a variety of subtexts:

- The Notice properly advises "You also have the right to select counsel of your own choosing" but the actual consent form steals that option away by mandating that "I specifically authorize the Named Plaintiffs and their attorneys, Berger & Montague, as my agents to prosecute this action on my behalf …" (language that also appears in the Notice contradicting the earlier proper statement on "the right to select counsel of your own choosing").

- The Notice properly lists Plaintiffs' counsel and an invitation to call in the same paragraph as the reminder of "the right to select counsel of your own choosing," but then crosses the line when it subsequently repeats this invitation to call regarding retaliation (retaliation is not an issue in this case, and there is zero basis in the pleadings or briefs to make that a valid concern).  That repetition (but now as a command rather than an invitation) is pure solicitation, like a bad commercial on late night television (*e.g.*, "In a wreck?  Need a check?  Call Lawyer X").

- Solicitation goes totally over the top with the number of distributions.  Plaintiffs propose five separate deliveries: (1) initial mail; (2) initial email; (3) 45-day reminder mail; (4) 45-day reminder email; and (5) posting at every work site for the entire 90 days.  Everything but highway billboards and milk carton ads.  That is impermissible solicitation.

Plaintiffs' own cited cases contradict their assertion that there is a basis for such overkill in distribution.  *Lewis v. Huntington Nat. Bank*, C2-11-CV-0058, 2011 WL 8960489, at *2 (S.D. Ohio June 20, 2011) (denying dual notification of mail and email;  "communicating by two methods serves no purpose."); *Davis v. Westgate Planet Hollywood Las Vegas*, LLC, No. 2:08-cv-00722-RCJ-PAL (Dkt. No. 75) at *19 ("The court denies plaintiffs' request for four separate forms of notice [including posting], and circulation is limited to notice by U.S. Mail and e-mail").  Other cases concur. *In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, H-11-2266, 2013 WL 2180014, at *3 (S.D. Tex. May 17, 2013) (rejecting email notice, notice posting and reminders); *Espenscheid v. DirecStat USA, LLC*, No. 09-CV-625-BBC, 2010 WL 2330309, at *14 (W.D. Wis. June 7, 2010) ( rejecting email notices; "Although this court

has allowed email distribution of notices in a previous case, I agree with the reasoning of the courts suggesting caution be used in allowing email notification").[9]

Here, there are no identifiable problems with regular mail reaching this workforce in 90 days: indeed, not a line in any submitted declaration suggests any problems in obtaining the important items that came by U.S. mail -- replacement credit cards; jury summons; property tax bills; deficiency notices from federal or state tax authorities; annual summaries from the Social Security Administration; etc.  With no unique problems in normal communication for a workforce covering only the last 36 months, the allowance of 90 days to receive and act upon that notice, and the availability of a third-party administrator to perform skip-tracing on any out-of-date address, regular U.S. mail remains the proper standard.  More than that is precisely and exactly the solicitation that *Hoffmann-La Roche Inc. v. Sperling, supra*, pointedly banned.

There are other problems but those are merely mechanical (seven days from the date of any court order to compile the mailing list and deliver it to the neutral third-party is too short) or oversights: the failure to advise potential class members of the potential risk that opting in may carry. *Adams v. Inter–Con Security Sys., Inc.,* 242 F.R.D. 530, 540 (N.D. Cal. 2007) ("Information that informs potential plaintiffs that they share in liability [for court-awarded costs] should be included to present to potential plaintiffs a fair statement of their rights"); *Creten-Miller v. Westlake Hardware, Inc.*, No. 08-2351-KHV, 2009 WL 2058734, at *6 (D. Kan. 2009); *Garcia v. Elite Labor Serv., Ltd.*, No. 95 C 2341, 1996 WL 33500122, at *4 (N.D.

---

[9]      Cases involving uncontested notice plans are hardly persuasive of what ought to be done where a notice plan is contested.  *See, e.g., Cranney v. Carriage Services, Inc.,* 2008 WL 608639 (D. Nev. Feb. 29, 2008) ("…as the Defendants have not objected to Plaintiffs' proposed notice  . . . ").  Likewise, following cases that blithely ignore the "no solicitation" mandate of *Hoffmann-La Roche Inc. v. Sperling, supra,* due to that issue being omitted in the briefing are equally unreliable.  *Accord*, *U.S. v. L.A. Tucker Truck Lines,* 344 U.S. 33, 38 (1952) (courts are "not bound by a prior [ruling] in a case where it was not questioned and it was passed sub silentio").

Ill. 1996) (same); *Harris v. Performance Transp., LLC*, No. 8:14-cv-2913, 2015 WL 1257404, at *11 (M.D. Fla. Feb. 13, 2015) (same).

If the Court decides that a collective action is warranted, it should -- as most courts do -- instruct the parties to confer and submit a joint notice plan in ten days.  That is the standard operating procedure in handling FLSA collective action notices as a matter of judicial economy and is endorsed by Plaintiffs' own cited cases. *Davis v. Westgate Planet Hollywood Las Vegas, LLC, supra* ("Counsel for the parties shall meet and confer in a good faith effort to arrive at a mutually acceptable form of notice . . . .").

## V.    CONCLUSION

For all of these reasons, this motion should be denied.

Messrs. Gundrum and King propose a collective action that is too large and, thus, unconnected to their own claims; that is manifestly unmanageable given the individualized assessments required under the FLSA in determining the application of the executive or administrative exemptions; and that is factually unsupported by their cursory mirror-image declarations.  As demonstrated at pp. 11-16, *supra*, the case law confirms that such under-supported and overbroad requests for collective action should be rejected.

Dated: August 29, 2016                           Respectfully submitted,


                                                  s/ *Rachel B. Cowen*
                                                  Rachel B. Cowen
                                                  Brian Mead
                                                  **DLA PIPER LLP (US)**
                                                  203 North LaSalle Street
                                                  Chicago, Illinois 60601-1293
                                                  Phone: (312) 368-7044
                                                  Fax: (312) 251-5844
                                                  Email: rachel.cowen@dlapiper.com

Email: brian.mead@dlapiper.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed on the ECF

docket and is available for viewing and download this 29th day of August, 2016.

<u>s/ *Rachel B. Cowen*</u>
Rachel B. Cowen